***FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

Electronically Filed
Supreme Court
SCAP-13-0005781
23-SEP-2015
09:22 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

SURFRIDER FOUNDATION; HAWAII'S THOUSAND
FRIENDS; KA IWI COALITION; and KAHEA – THE
HAWAIIAN-ENVIRONMENTAL ALLIANCE,
Petitioners/Plaintiffs-Appellants,

vs.

ZONING BOARD OF APPEALS, CITY & COUNTY OF HONOLULU;
DIRECTOR OF THE DEPARTMENT OF PLANNING &
PERMITTING, CITY & COUNTY OF HONOLULU; KYO-YA
HOTELS & RESORTS LP; AND 20,000 FRIENDS OF LABOR,
Respondents/Defendants-Appellees.

SCAP-13-0005781

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-13-0005781; CIV. NO. 13-1-0874-03)

September 23, 2015

NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.,
WITH RECKTENWALD, C.J., CONCURRING SEPARATELY

OPINION OF THE COURT BY POLLACK, J.

**I. INTRODUCTION**

In 1976, the Honolulu City Council established the

Waikiki Special Design District in response "to the rapid

development of the 1960s and 1970s, and the changes produced by that development."  The City Council found that "[t]o the world, Waikiki is a recognized symbol of Hawai'i [] and the allure of Waikiki continues, serving as the anchor for the state's tourist industry."  The Council concluded that while "Waikiki needs to maintain its place as one of the world's premier resorts in an international market [], the sense of place that makes Waikiki unique needs to be retained and enhanced."  Accordingly, the City Council developed specific requirements and design controls "to guide carefully Waikiki's future and protect its unique Hawaiian identity."

Among the provisions enacted to protect Waikiki's Hawaiian identity is a limitation on development next to the shoreline.  The Council established a coastal height setback requirement because of the "need to step back tall buildings from the shoreline to maximize public safety and the sense of open space and public enjoyment associated with coastal resources."  The Council also provided for a variance process when compliance with the Land Use Ordinance would result in unnecessary hardship.

In this case, we are called upon to determine whether a variance granted for a proposed 26-story hotel and residential

tower that permitted a 74 percent encroachment into the coastal height setback along the Waikiki shoreline was properly issued.[1]

## II.  BACKGROUND

### A.    The Waikiki Special District

The Land Use Ordinance of the City and County of Honolulu (LUO) designates "certain areas in the community in need of restoration, preservation, redevelopment or rejuvenation" as special districts.  Revised Ordinances of the City and County of Honolulu (ROH) § 21-9.20 (1990).  For each special district, the LUO sets forth objectives, identifies prominent view corridors and historic properties, and outlines requirements and design controls to guide development to "protect [and] enhance the physical and visual aspects of [the district] for the benefit of the community as a whole."  ROH § 21-9.20-1.

The Honolulu City Council (City Council) designated the Waikiki Special District[2] "to guide carefully Waikiki's future and protect its unique Hawaiian identity."  ROH § 21-

---

[1]    The quoted passages in the Introduction are from provisions of the Land Use Ordinance of the City and County of Honolulu that will be discussed later in this Opinion.

[2]    The Waikiki Special Design District was renamed the Waikiki Special District.  The boundaries of the WSD are defined by a map accessible at: http://www.honolulu.gov/rep/site/ocs/roh/ROH_Chapter_21_Exh9.1-9.18_art10__.pdf.pdf (last visited September 2, 2015).  The WSD is bounded on the north and west by Ala Wai Blvd. (including the piers in the Ala Wai Yacht Harbor), on the south by the Pacific Ocean, and on the west by Kapahulu Ave.

9.80. Within the Waikiki Special District (WSD), the City Council recognized the need to step back buildings from the shoreline in order to optimize "the sense of open space and public enjoyment along the beach." ROH § 21-9.80-4(g)(2). To accomplish this objective, the City Council established the following minimum setbacks that "apply to all zoning lots along the shoreline" within the WSD:

> (A) There shall be a building height setback of 100 feet in which no structure shall be permitted. This setback shall be measured from the certified shoreline;[3] and
>
> (B) Beyond the 100-foot line there shall be a building height setback of 1:1 (45 degrees) measured from the certified shoreline.

ROH § 21-9.80-4(g)(2) (Coastal Height Setback).

The WSD requirements and design controls set forth in the LUO are "supplemented by a design guidebook" (WSD Design Guidebook) that "shall be used as a principal tool by the director to express those . . . elements which demonstrate consistency with the intent, objectives, guidelines, and

---

[3] The certified shoreline is depicted in ROH Exhibit 21-1.15, and defined within the Hawai'i Administrative Rules § 13-222-2 (adopted December 13, 2002), as "a signed statement by the chairperson of the board of land and natural resources that the shoreline is as located and shown on the map as of a certain date." "Shoreline" is defined as:

> the upper reaches of the wash of the waves, other than storm or seismic waves, at high tide during the season of the year in which the highest wash of the waves occurs, usually evidenced by the edge of vegetation growth, or the upper limit of debris left by the wash of the waves.

Id.

standards of the [WSD]." ROH § 21-9.80-4. With respect to the Coastal Height Setback, the WSD Design Guidebook provides, "A setback from the shoreline is required to maximize public safety, the sense of open space, lateral access along the beach, and the public enjoyment associated with our coastal resources."[4] Additionally, the Coastal Height Setback is designed to "contribute to a Hawaiian sense of place" by "reduc[ing] the perception of crowding, enhanc[ing] the aesthetics of Waikiki and impart[ing] a greater sense of Hawaiiana in the built environment." WSD Design Guidebook at 25.

Although the City Council enacted the LUO to "provide reasonable development and design standards for the location, height, bulk and size of structures," a party may apply for a variance on the basis of unnecessary hardship by submitting an application to the Honolulu Department of Planning and Permitting. Revised Charter of the City and County of Honolulu (RCCCH) § 6-1517 (2000 Edition, 2003 Supp.). In order to establish unnecessary hardship, the applicant must demonstrate that the following three requirements as prescribed in the City Charter have all been met:

---

[4] Dep't of Planning and Permitting, City and Cnty. of Honolulu, WSD Design Guidebook (May 2002), http://www.honoluludpp.org/Portals/0/pdfs/zoning/WSD.pdf (last visited September 2, 2015); ROH § 21-9.80-4(g)(2).

(1) the applicant would be deprived of the reasonable use of such land or building if the provisions of the zoning code were strictly applicable;

(2) the request of the applicant is due to unique circumstances and not the general conditions in the neighborhood, so that the reasonableness of the neighborhood zoning is not drawn into question; and

(3) the request, if approved, will not alter the essential character of the neighborhood nor be contrary to the intent and purpose of the zoning ordinance.

Id.  Upon receipt of a variance application, the Director of the Department of Planning and Permitting must hold a public hearing.  Id.  If the variance application is granted, the Director, in its decision, "shall specify the particular evidence which supports granting of [the] variance."  Id.

### B.    Kyo-ya's Variance Application to Encroach into the Coastal Height Setback

Kyo-ya Hotels & Resorts LP (Kyo-ya) is the fee-simple owner of the Moana Surfrider hotel complex, which contains three hotel buildings--the Surfrider Tower, the Banyan Wing, and the Diamond Head Tower (DHT)--on a combined zoning lot located on Kalākaua Avenue along the Waikiki shoreline.  In 2010, Kyo-ya submitted a land use permit to redevelop the existing 8-story DHT with a 26-story, 282 foot hotel and residential tower (the Project).  Due to the Project's size, location, and design, the Project required several permits and approvals, including a variance to allow the Project to encroach into the Coastal Height Setback.

On March 19, 2010, Kyo-ya submitted variance application No. 2010/VAR-9 (variance application) to the Department of Planning and Permitting requesting that the Project be allowed to encroach into the Coastal Height Setback. As proposed, the Project would encroach about 40 feet into the 100-foot coastal setback at the building's ewa corner[5] and about 60 feet at the Diamond Head corner. Additionally, a significant portion of the building up to the 16th floor would encroach into the 1:1 height setback measured from the certified shoreline, and "from the 17th floor, the entire building encroaches into the coastal height setback." In total, "about 74.3 percent of the building encroaches into the Coastal Height Setback"; "Conversely, only 25.7 percent of the building complies with the coastal height setback."

In its variance application, Kyo-ya maintained that although the Project was "unable to comply with the strict requirements of [the Coastal Height Setback]," the Project satisfied the three requirements for issuance of a variance.

---

[5] "Ewa" is defined as a "[p]lace name west of Honolulu, used as a directional term." M. Pukui & S. Elbert, Hawaiian Dictionary 42 (rev. ed. 1986).

### i. First Requirement: Deprived of the Reasonable Use of the Applicant's Land or Building

Kyo-ya argued it would be deprived of the reasonable use of its land if the LUO was strictly applied because the ordinance would "reduce the buildable portion of the property to roughly 11,283 square feet, or approximately 33% of the whole lot area." If the LUO "were strictly followed," Kyo-ya contended that it "would not even be able to rebuild the existing [DHT]."[6]

Kyo-ya maintained that the State of Hawaiʻi entered into an agreement in 1965 with the owners of certain beach front parcels under which the State committed to expand the beach and "[p]rotect and preserve all existing beach" in a designated area (1965 Beach Agreement).[7] Although the contemplated beach

---

[6]    As discussed infra, the LUO allows for the renovation or reconstruction of nonconforming uses and structures, subject to certain conditions and approvals. See ROH § 21-9.80-4(e).

[7]    In the 1965 Beach Agreement, Line B represents the makai property line and Line A designates the current certified shoreline. The text of the agreement states, in part, as follows:

> 1. The State will use its best efforts to construct the beach seaward of Line B in the Surfrider-Royal Hawaiian Sector substantially in accordance with the Cooperative Project.
>
> . . .
>
> 3. The Owners will release and quitclaim to the State forever all of their respective estate, right, title and interest . . . in and to the Surfrider-Royal Hawaiian Sector of Waikiki Beach now or from time to time hereafter existing seaward of Line B, whether created by

(continued . . .)

expansion was never completed, Kyo-ya asserted that had "the beach been constructed by the State" pursuant to the 1965 Beach Agreement, "it is likely that the beach fronting the [DHT] site would be approximately 180 feet wider than it is today" and the shoreline would have been recertified to reflect the increased width. Additionally, if the beach had been extended, Kyo-ya submitted that "almost no portion of the [Project] would encroach into the coastal height setback."

### ii. Second Requirement: Unique Circumstances

Kyo-ya contended that the reasonableness of the neighborhood zoning was not drawn into question by its variance request because it was "forced" to apply for a variance due to unique circumstances, rather than as a result of general conditions in the neighborhood. For example, the Project site

---

(continued . . .)

> construction or otherwise, reserving to the Owners . . . full and free access between their respective abutting lands and the sea across said beach and to use said beach for a bathing beach and foot passage.
>
> . . .
>
> 5. The State will release and quitclaim to the respective Owners . . . severally in proportion to their respective frontages along Line A . . . contemporaneously with the Owners' conveyance to the State . . . all the land of the Surfrider-Royal Hawaiian Sector of Waikiki Beach between Lines A and B . . . PROVIDED, HOWEVER, that said land between lines A and B shall remain subject to the public easement . . . until a beach at least seventy-five (75) feet wide shall have been created seaward of Line B.

"is bounded on the Ewa side by the historic Banyan Wing," which is listed on the National and State Register of Historic Places. Kyo-ya argued that it had foregone considerable financial gain by choosing not to redevelop the Banyan Wing and that "[i]f Kyo-ya chose to redevelop this portion of the complex, it could develop a hotel or residential tower that meets all LUO, WSD and [Planned Development-Resort (PD-R)] requirements."

Additionally, Kyo-ya contended the Project site "is among the narrowest parcels of land along Waikiki Beach" that is subject to the Coastal Height Setback."  The narrowness of the Project site "is exacerbated," Kyo-ya argued, "by the absence of the substantial beach which was to have been built by the State per the 1965 Beach Agreement" in addition to the presence of the historic Banyan Wing.  Kyo-ya further argued that the parcel's "unique size and shape" caused the impact of the Coastal Height Setback to be "greater than on any other parcel along Waikiki Beach."

### iii. Third Requirement: Essential Character of the Neighborhood and Intent and Purpose of the Ordinance

With respect to the third requirement, Kyo-ya submitted that the variance "will not alter the essential character of the locality nor be contrary to the intent and purpose of the zoning code."  Kyo-ya characterized Waikiki as "a densely developed, urbanized area, filled with large hotels,

condominiums, and mixed-use projects which push (and in many cases exceed) the limits of permitted heights, densities, and other zoning and building regulations."  Kyo-ya argued that many of the "existing hotels along Waikiki Beach already encroach into the coastal height setback" and that allowing the Project to similarly encroach would not alter the essential character of Waikiki.  Kyo-ya contended the Project's "mauka-makai orientation, increased public open space, improved beach access and addition of surfboard racks should go a long way toward restoring the character of Waikiki."

Additionally, Kyo-ya asserted the Project was consistent with WSD objectives to "[p]rovide for the ability to renovate and redevelop existing structures which might otherwise experience deterioration" and allow for "creative development capable of substantially contributing to rejuvenation and revitalization of the [WSD]."  Kyo-ya maintained that the Project was consistent with the WSD objective to "improve where possible mauka views . . . and a visual relationship with the ocean" and the objective to "[p]rovide people-oriented, interactive, landscaped open spaces to offset the high-density urban ambience."

Finally, Kyo-ya argued that the impact of the encroachment into the Coastal Height Setback would be mitigated

11

by the State of Hawaii's planned Waikiki Beach Maintenance Project (Beach Maintenance Project) that is "expected to add roughly forty-feet (40') of dry beach to the beach fronting the [DHT]."

### C.   Director's Decision

The Director held a public hearing on Kyo-ya's variance application and subsequently issued Findings of Fact, Conclusions of Law, and Decision and Order (Director's Decision or Decision) granting "Partial Approval" of Kyo-ya's variance application.

In his Decision, the Director described the variance application as a request to allow the Project to encroach approximately 74 percent into the Coastal Height Setback.  The Director noted that in addition to the variance request from the Coastal Height Setback, the Project required additional approvals and permits, including a Planned Development-Resort (PD-R) Permit.[8]

---

[8]     The purpose of a PD-R permit is described within the LUO as follows:

> [T]o provide opportunities for creative redevelopment not possible under a strict adherence to the development standards of the special district.  Flexibility may be provided for project density, height, precinct transitional height setbacks, yards, open space and landscaping when timely, demonstrable contributions benefiting the community and the stability, function, and overall ambiance and appearance of Waikiki are produced.

(continued . . .)

The Director then set forth his analysis of the City Charter variance test. As to the first requirement--that the strict application of the zoning code would deprive Kyo-ya of the reasonable use of its land or building--the Director noted that Kyo-ya had argued the existing DHT is "extremely outdated" and if not allowed to be redeveloped, it "would contribute to the decline of the already aging structure." Consequently, the Director found that "the proposal is necessary to maintain economic viability." The Director also found that the proposal was consistent with the WSD objectives "to provide opportunities for creative development that contribute to the rejuvenation and revitalization of the special district," "to provide the ability to renovate and redevelop existing structures which otherwise might experience deterioration," and "to facilitate the desired character of Waikiki for areas susceptible to change."

The Director noted Kyo-ya had indicated that if it complied with all "required yard, height, and transitional

---

(continued . . .)

> Reflective of the significance of the flexibility represented by this option, it is appropriate to approve projects conceptually by legislative review and approval prior to more detailed review and approval by the department.

ROH § 21-9.80-4(d). Kyo-ya's PD-R application requested flexibility in WSD standards to allow the Project to have greater density, increased height, and less open space than otherwise would be required.

height setbacks,"[9] the "building would have to take the form of a massive monolithic wall."  The Director concluded that in comparison, the Project "offers some important design advantages that are more conducive to the WSD design objectives, but that can only be accomplished by a trade-off in terms of coastal setback encroachments."

The Director addressed the physical constraints of the site that restrict development along the shoreline.  The Director found that if the zoning code was strictly applied, the buildable area of the DHT Lot "would be reduced to less than 35 percent" with a maximum height limit of about 170 feet.  Consequently, the Director found that if Kyo-ya were not granted the requested variance, Kyo-ya "would not be able to develop in accordance with the [PD-R] permit."

Next, the Director found that the extent of Kyo-ya's requested 74 percent encroachment into the Coastal Height Setback would have been significantly reduced "[i]f the beach

---

[9]     "Precinct transitional height setbacks" is a distinct requirement under the LUO and separate from the Coastal Height Setback at issue in this appeal.  As set forth in ROH Table 21-9.6(B) and ROH § 21-9.80-6(c)(2), precinct transitional height setbacks are as follows:

> Transitional Height Setbacks.  For any portion of a structure above 40 feet in height, additional front, side and rear height setbacks equal to one foot for each 10 feet in height, or fraction thereof, shall be provided.  Within the height setback, buildings with graduated, stepped forms shall be encouraged (see Figure 21-9.2).

14

had been constructed and/or maintained as agreed to by the State [under the 1965 Beach Agreement, because] the certified shoreline would probably be located much farther seaward than the existing shoreline." The Director reasoned, "The proposal, viewed in [the context of the 1965 Beach Agreement], is not excessive." The Director additionally found that under the Waikiki Beach Maintenance Project, the beach would be increased by 40 feet and that the certified shoreline "would likely reflect the beach expansion."

The Director concluded that "[f]or these and other reasons," Kyo-ya "would be denied reasonable use of the site if not allowed to encroach into the present 100-foot coastal setback and the coastal height setback." However, the Director also concluded that "the proposed setback encroachment exceeds what would be allowed if the beach width were increased by 180 feet"; therefore, "the height of the [Project] should be reduced to comply with the . . . coastal height setback as measured from . . . (the beach width intended in the 1965 [Beach] Agreement)."

With regard to the second requirement of the variance test, the Director found Kyo-ya's application to be "supported by unique circumstances" including that the Project lot is "one of the narrowest lots along the shoreline in [the] area except

for the public beach park lots."[10]  The Director noted that compliance with the 20-foot front yard setback and the 100-foot coastal setback effectively reduces the buildable area of the DHT lot by 33 percent.

The Director found the shoreline to be another "unique circumstance [of the site]."  The Director stated that while the "variance and/or encroachments are based on the existing [certified] shoreline," "the shoreline along the site is subject to drastic change by artificial means, and, in fact, may move seaward by roughly 40 feet under the planned [Waikiki Beach Maintenance Project]."  In light of the restoration plan, the Director concluded, "It would be reasonable to allow full development to proceed at this time, considering that the encroachments will be reduced substantially once the beach restoration is done."

As to the third requirement of the variance test, the Director concluded the Project would not alter the essential character of the neighborhood.  The Director found the

---

[10]   The Director noted that Kyo-ya's Special Management Permit required Kyo-ya to preserve the historic Banyan Wing for a minimum of 25 years and that "[t]he proposed encroachments would permit [Kyo-ya], in effect, to transfer some of the development potential from the Banyan Wing site to the DHT site."  The Director maintained this "transfer" would "be a fair trade-off, since the proposal would also promote several important WSD goals and objectives."  However, the Director also noted that Kyo-ya "indicated that [it has] no intention of removing the historic Banyan Wing."

"established character of Waikiki" to be "a densely populated and highly developed, urbanized area, which includes a wide mix of land uses." Further, the Director noted that "[m]any existing structures are nonconforming and exceed the height limit and maximum density [], encroach into required yards and setbacks, and lack the minimum open space and landscaping."

The Director additionally found the Project to be "consistent with several important WSD objectives." The Director determined that "the new building is necessary to replace an aging, declining structure with a new, more attractive and functional structure, which will enhance Waikiki as a visitor destination"; allow Kyo-ya to preserve the historic Banyan Wing; and "provide[] public access to the beach, view channels from Kalākaua Avenue to the ocean, as well as other significant public benefits."

After analyzing the variance test's three requirements, the Director made the following Conclusions of Law:

> 1) There is evidence that the Applicant would be deprived of a reasonable use of the land or building if the provisions of the zoning code were strictly applied.
>
> 2) The request of the applicant is due to unique circumstances and not to general neighborhood conditions, and it does not question the reasonableness of the neighborhood zoning.
>
> 3) The request will not alter the essential character of the neighborhood nor be contrary to the intent and purpose of the zoning ordinance.

Accordingly, the Director granted partial approval of Kyo-ya's variance application to allow the Project to encroach approximately 74 percent into the Coastal Height Setback.  The Director's partial approval was conditioned on, inter alia, submission of revised plans "which show the [Project] shall comply with the 1-to-1 (45-degree angle) coastal height setback as measured from . . . (the approximate beach width intended in the [1965 Beach Agreement])."[11]

### III. Appellate Proceedings

### A. Zoning Board of Appeals[12]

Surfrider Foundation, Hawaii's Thousand Friends, Ka Iwi Coalition, and KAHEA--The Hawaiian Environmental Alliance (collectively, Surfrider) filed a petition (Petition) to the Zoning Board of Appeals (ZBA) challenging the Director's findings and conclusion that Kyo-ya's request for a variance from the Coastal Height Setback met the requirements for issuance of a variance as set forth by the City Charter.[13]  In

---

[11]    According to Kyo-ya, the Director's condition effectively reduced the height of the Project by approximately six floors.

[12]    The ZBA held a hearing to decide motions to intervene filed by numerous parties at which the ZBA granted intervenor status to Kyo-ya, 20,000 Friends of Labor, Hawaii's Thousand Friends, Ka Iwi Coalition, Surfrider Foundation, and KAHEA--The Hawaiian Environmental Alliance.

[13]    Kyo-ya filed a motion to dismiss Surfrider's appeal, arguing that Surfrider's appeal was substantively and procedurally insufficient under RCCCH § 6-1516.

(continued . . .)

its position statement, Surfrider argued that the Director's conclusion that the Project satisfied the three requirements of RCCCH § 6-1517 was based on erroneous findings of material facts.

Surfrider maintained that Kyo-ya did not meet the first requirement for issuance of a variance because "the record indicates that [Kyo-ya] would not be deprived of reasonable use of the property if the variance is denied." Surfrider contended that the "property is already occupied by a non-conforming, 8-story hotel building that can be fully renovated without the need for a variance under the [LUO]," that Kyo-ya was not entitled to achieve all of the applicable maximum development standards in the LUO, and that the 1965 Beach Agreement had not been realized.

_____

(continued . . .)

    RCCCH § 6-1516 provides, in relevant part, as follows:

        Section 6-1516. Zoning Board of Appeals –

        . . . An appeal shall be sustained only if the board finds
        that the director's action was based on an erroneous
        finding of a material fact, or that the director had acted
        in an arbitrary or capricious manner or had manifestly
        abused discretion.

The ZBA granted in part, and denied in part Kyo-ya's motion. The ZBA found that Surfrider "asserted in [its] Petition that the Director's action in partially approving the Variance Application was based upon one or more erroneous findings of material fact" but that Surfrider "did not allege or argue in the Petition that any aspect of the Director's action . . . was arbitrary or capricious or a manifest abuse of the Director's discretion."

19

Surfrider argued that Kyo-ya failed to meet the second requirement because the property is not particularly unique and is typical of the general conditions of ocean-front property in that part of Waikiki." Thus, Surfrider maintained that the reasonableness of the neighborhood zoning is in fact drawn into question by the variance request.

Surfrider argued the third requirement was also not met because "the request, if approved, will alter the essential character of the locality and is contrary to the intent and purpose of the zoning code." Surfrider pointed out that the Director's findings "did not even address whether the project is contrary to the intent and purpose of the WSD, whose objectives center on maintaining Waikiki's unique Hawaiian identity and reducing the apparent height of buildings."

Kyo-ya, the Director, and 20,000 Friends of Labor (Friends of Labor) each filed a position statement with the ZBA. Kyo-ya argued that Surfrider "fail[ed] to allege a single finding of material fact to have been in error let alone 'clearly erroneous.'" Kyo-ya maintained that the Director specified the particular evidence that supported his granting of the variance and properly concluded that all three requirements for a zoning variance had been satisfied.

As to the first variance requirement, Kyo-ya contended that it would be denied reasonable use of its property if it were not allowed to encroach into the Coastal Height Setback. Kyo-ya asserted that the 1965 Beach Agreement conferred on it "rights and expectation granted by the state" that must be considered in determining what reasonable use it could expect of its property. Kyo-ya additionally argued that it "has the right under the current WSD and its PD-R to construct the density/floor area it proposes" but that without the variance the resulting building would be materially inconsistent with the WSD objectives and guidelines.

With regard to the second requirement, Kyo-ya asserted that the Moana Parcel has the greatest width-to-depth ratio of any parcel along Waikiki Beach and includes a historic structure. Thus, Kyo-ya argued the Director properly concluded that the Moana Parcel has unique circumstances that do not call into question the general zoning code.

In addressing the third requirement, Kyo-ya maintained, "It cannot be disputed that Waikiki is a highly urbanized area [] with many large and tall buildings in close proximity to the Moana Parcel." Kyo-ya therefore contended the "essential character of the neighborhood is a dense urban area full of tall hotel and condo buildings."

21

The Director in his position statement argued the record demonstrates that his partial approval of Kyo-ya's variance application was based on clearly established facts and was a reasonable exercise of his discretion. The Director restated his findings and analysis as to the requirements of the variance test from his Decision. He also reiterated his conclusion that the Project satisfied the variance test with the condition that the Project's height should be reduced to comply with the 1:1 coastal height setback measured from the beach width intended by the 1965 Beach Agreement because the agreement provided a basis to determine the parameters of a reasonable height limitation.

The ZBA issued its Findings of Fact, Conclusions of Law, and Decision and Order (ZBA Order) on February 14, 2013. The ZBA found Surfrider "offered insufficient competent, reliable and probative evidence to establish that the Director's Decision was clearly erroneous" or that any material fact relied upon by the Director was clearly erroneous. The ZBA also found that Surfrider "offered no competent, reliable and probative evidence" to demonstrate the following:

> 103. That the 1965 Beach Agreement . . . was without legal effect, had terminated by its terms, or had been terminated by the parties or operation of law, [or] that the Director was precluded from considering, or in error for considering, the 1965 Beach Agreement to aid in his determination of what would be reasonable limits to the extent of the variance.

22

Accordingly, the ZBA denied Surfrider's appeal of the Director's Decision.[14]  Surfrider timely filed a notice of appeal to the Circuit Court of the First Circuit (circuit court) from the ZBA Order.

## B. Circuit Court

In its opening brief,[15] Surfrider argued that the Director breached his duty to enforce the LUO when he granted Kyo-ya a partial variance "contingent upon compliance with a hypothetical certified shoreline 180 feet out to sea from the current certified shoreline."  Surfrider contended that "variances must be based on the current certified shoreline, not some undetermined future shoreline."

Surfrider next addressed the requirements for issuance of a variance.  As to the first requirement of the variance test, Surfrider reasserted the following: (1) the Director did not provide evidentiary support for its conclusion that Kyo-ya would be deprived of the reasonable use of its land if it was required to comply with the Coastal Height Setback; (2) the Director erroneously found that the failure of the State to

---

[14]     The ZBA additionally noted Surfrider waived any argument that the Director acted in an arbitrary or capricious manner or had manifestly abused his discretion.

[15]     In its opening brief, Surfrider presented seventeen points of error and identified nine erroneous findings with respect to the ZBA Order.

implement the 1965 Beach Agreement amounts to a deprivation of reasonable use; and (3) the other findings in the Director's analysis are not relevant to whether Kyo-ya would be denied reasonable use. Surfrider further argued that reasonable use of the land, within the meaning of the City Charter does not necessarily mean "the use most desired by the owner" and the fact that Kyo-ya might make a greater profit by using its property in a manner prohibited by the ordinance is irrelevant.

Next, in regard to the second requirement of the variance test, Surfrider argued that the Director addressed only the unique circumstances aspect and did not address whether the reasonableness of the neighborhood zoning would be drawn into question "by the granting of a variance of unprecedented magnitude."

With respect to the third requirement, Surfrider argued that, while the Director addressed the essential character of the neighborhood in his Decision, he did not address whether the Project is contrary to the intent and purpose of the zoning ordinance. Surfrider conceded the Project may be in conformity with the non-conforming buildings in the neighborhood built before the WSD was adopted"; however, Surfrider argued it is not in conformity with the historic character of the neighborhood.

In his answering brief, the Director restated his findings of fact and analysis contained within his Decision and reasserted his conclusions.  The Director contended that, contrary to Surfrider's argument, he did not rely upon the 1965 Beach Agreement to determine whether Kyo-ya would be denied reasonable use under RCCCH § 6-1517, but rather to consider the reasonableness and impose a limit on the extent of the variance permitted.

Kyo-ya and Friends of Labor argued in their respective answering briefs that none of the alleged erroneous facts Surfrider identified were actually erroneous or material to the Director's Decision.[16]  Kyo-ya asserted that contrary to Surfrider's contention, the ZBA's findings of fact were "more than adequate" to support its conclusion.

Kyo-ya also contended that Surfrider "misconstrue[d] the Director's Decision," which "did not grant a variance that is 'conditioned upon compliance with a hypothetical certified shoreline.'"  Kyo-ya further argued that Surfrider's interpretation of case law as requiring the applicant to prove that it "would have been denied 'any reasonable use' but for"

---

[16]    In its reply brief to Friends of Labor, Surfrider maintained that the Director did not evaluate the "economic viability of the proposed structure as compared to other structural options" but rather based his decision on "a series of hypothetical scenarios that amount to erroneous facts."

the variance is misleading, would eliminate the Director's discretion, and "would bring an end to land use in Hawai'i as it has been practiced since statehood."

After a hearing on Surfrider's appeal, the circuit court entered its Findings of Fact, Conclusions of Law, and Decision and Order Affirming the Decision and Order of the ZBA (circuit court's Order). The circuit court concluded that Surfrider "failed to satisfy [its] burden to demonstrate that the Director's action in partially approving the [Zoning] Variance Application was based on any erroneous findings of material fact."

Surfrider filed a notice of appeal from the circuit court's Order affirming the ZBA Order.[17]

## C. Supreme Court[18]

In its opening brief, Surfrider reiterates that it was Kyo-ya's burden to prove that its project satisfies all three requirements of the variance test and that the Director's

---

[17] On April 10, 2014, Surfrider filed an application to transfer its appeal to this court, which was granted on May 15, 2014.

[18] Additionally, Surfrider contends the Director failed to adequately support his findings and that evidence of insufficient material support for a required factual finding that a variance requirement has been met is evidence of an erroneous finding, not evidence of abuse of discretion. Kyo-ya argues that Surfrider's challenge to the Director's reliance on the 1965 Beach Agreement, as well as to the Director's determination of whether the Project meets the three requirements of the variance test, involves the Director's discretion, and was thus waived.

Decision "plainly indicate[s] that neither [Kyo-ya] nor the Director met [their] burden."[19]  Surfrider again points out that the 1965 Beach Agreement "does not provide a legal basis for a variance" from the LUO "which requires building setbacks to be measured from the current certified shoreline."  Surfrider asks that this court reverse the circuit court's Order and the Director's Decision and deny Kyo-ya's variance application.

Kyo-ya responds that the Director did not rely on the 1965 Beach Agreement to justify the variance, but rather looked to the agreement after the Director determined "a variance was warranted" to determine the extent of the variance to grant.  In any event, Kyo-ya argues that "even if Surfrider could somehow show that consideration of the 1965 Beach Agreement was improper, this would not be sufficient to reverse the ZBA."  With respect to finding deprivation of "reasonable use," Kyo-ya argues "this was not a situation where Kyo-ya was simply trying to make a 'greater profit'; instead, the Director found that the variance was 'necessary to maintain economic viability.'"  Kyo-

---

[19]  Surfrider additionally argues that the Director does not have discretion to grant variances from "mandatory zoning code requirements." Because Surfrider did not previously raise this argument, it is not considered.  Mizoguchi v. State Farm Mut. Auto. Ins. Co., 66 Haw. 373, 383, 663 P.2d 1071, 1077 (1983).

ya additionally reasserts arguments that it previously made in prior proceedings.[20]

## IV.  Standards of Review

### A. Findings and Conclusions

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998).  The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) to the agency's decision. Id.

Under HRS § 91-14(g)(5) (1993), findings of fact are reviewed to determine whether they are "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record."  A finding of fact is clearly erroneous when the record lacks substantial evidence--i.e., credible evidence of a sufficient quality and probative value to enable a person of reasonable caution to support a conclusion--to support the finding.  Bremer v. Weeks, 104 Hawai'i 43, 51, 85 P.3d 150, 158

---

[20]     The Director and Friends of Labor each filed their respective answering briefs in which they asserted arguments that were submitted in the proceedings below or presented by Kyo-ya in its answering brief.

(2004); McPherson v. Zoning Bd. of Appeals, 67 Haw. 603, 606, 699 P.2d 26, 28 (1985).

A "[conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." Price v. Zoning Bd. of Appeals of City & Cnty. of Honolulu, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994). Because the Director's conclusions of law in this case presented mixed questions of fact and law, they are reviewed "under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." Poe v. Hawai'i Labor Relations Bd., 87 Hawai'i 191, 195, 953 P.2d 569, 573 (1998).

### B. Incompetent Evidence

"The admission of irrelevant or incompetent matter before an administrative agency does not constitute reversible error if there is substantial evidence in the record to sustain the agency's determination." Shorba v. Bd. of Educ., 59 Haw. 388, 397, 583 P.2d 313, 319 (1979) (quoting Schyman v. Dep't of Registration & Educ., 133 N.E.2d 551, 525-26 (Ill. App. Ct. 1956)). However, if a petitioner can show prejudice resulting from the admission of irrelevant or incompetent evidence, the

29

admission of such evidence may be grounds for reversal.  See id.; Price, 77 Hawaiʻi at 176, 883 P.2d at 637.  "[P]rejudice cannot be alleged to the admission of improper evidence unless it be shown that the [agency] relied on it."  Shorba, 59 Haw. at 397, 583 P.2d at 319 (quoting Schyman, 133 N.E.2d at 561-562).

### C. Interpretation of a Statute, Ordinance, or Charter

"The interpretation of a statute, ordinance or charter is a question of law reviewable de novo."  Korean Buddhist, 87 Hawaiʻi at 229, 953 P.2d at 1327 (alterations omitted) (quoting State v. Arceo, 84 Hawaiʻi 1, 10, 928 P.2d 843, 852 (1996)) (internal quotation marks omitted).

### V.  Discussion

The Director may grant a variance from a provision of the LUO upon the ground of unnecessary hardship if the three requirements set forth in RCCCH § 6-1517 have been satisfied:

> (1) the applicant would be deprived of the reasonable use of such land or building if the provisions of the zoning code were strictly applicable;
>
> (2) the request of the applicant is due to unique circumstances and not the general conditions in the neighborhood, so that the reasonableness of the neighborhood zoning is not drawn into question; and
>
> (3) the request, if approved, will not alter the essential character of the neighborhood nor be contrary to the intent and purpose of the zoning ordinance.

"The burden of establishing the factual foundation for the foregoing legal preconditions rests with the applicant," Korean

30

Buddhist, 87 Hawai'i at 234, 953 P.2d at 1332 (citing McPherson, 67 Haw. at 607, 699 P.2d at 28); however, it is the Director who, prior to granting a variance, must "specify the particular evidence which supports the granting of the variance." RCCCH § 6-1517.[21] In its appeal, Surfrider argues that the circuit court erred in affirming the ZBA Order and the Director's Decision because the Director's findings and conclusions did not demonstrate that Kyo-ya satisfied the three requirements for issuance of the variance.

**A. Deprived of the Reasonable Use of Land or Building**

To satisfy the first variance requirement, the record must show that "the applicant would be deprived of the reasonable use of such land or building if the provisions of the zoning code were strictly applicable." RCCCH § 6-1517. "Reasonable use," within the meaning of the charter, "is not necessarily the use most desired by the property owner"; rather, to be deprived of the reasonable use of its property, the property owner must establish an inability to make reasonable

---

[21]    The role of the Director in evaluating an application for a variance from a provision of the LUO is greater than that of an impartial arbiter of fact. "Unlike an ordinary court, the [Director] has the function of serving as an advocate of the public interest." Final Report of the Charter Commission of the City and County of Honolulu 1971-1972 at 34 (citation omitted). The Director "should always place this consideration foremost, rather than looking upon its duties as that of a simple arbitration of disputes among private parties." Id.

use of its land or building without the variance. Korean Buddhist, 87 Hawai'i at 234-5, 953 P.2d at 1332-33 (applicant failed to show that it could not make reasonable use of the land or its hall without the requested variance); McPherson, 67 Haw. at 605-06, 699 P.2d at 28 (finding the applicant had not established deprivation of reasonable use because the record was "devoid of any evidence that the applicant could not make reasonable use of the land or buildings in conformity with the [zoning code] or her pre-existing nonconforming use"); see also RCCCH § 6-1517 n.30 ("[W]ithin the meaning of the charter," "reasonable use" "is not the use most desired by the property owner; [the] property owner must show inability to make any reasonable use of his land without the variance.").

In this case, the Director concluded "[t]here is evidence that [Kyo-ya] would be deprived of a reasonable use of the land or building if the [Coastal Height Setback] was strictly applied" for the following reasons: the Project is necessary to maintain economic viability; the zoning code would reduce the buildable area of the DHT lot; if not allowed the variance, Kyo-ya would not be able to develop in accordance with the PD-R permit; the 1965 Beach Agreement would have resulted in a significantly different buildable area on the site; and the current beach replenishment project will extend the beach width

32

by a minimum of 40 feet and the certified shoreline will likely reflect the beach expansion.[22]

Surfrider challenges both the Director's ultimate conclusion that Kyo-ya satisfied this requirement of the variance test, as well as several of the underlying findings the Director based his conclusion upon. Surfrider specifically contends that the Director erroneously found that Kyo-ya would be denied reasonable use based on the 1965 Beach Agreement and that the Project "is necessary to maintain economic viability." Each of the Director's reasons for concluding that "there is evidence" that Kyo-ya would be deprived of the reasonable use of the land is addressed below.

### i. Economic Viability[23]

The Director based his conclusion that Kyo-ya would be deprived of a "reasonable use" if the Coastal Height Setback was strictly applied in part on his finding that the Project "is

---

[22] The Director additionally mentioned several WSD objectives in his discussion of the first requirement of the variance test. For example, the Director stated that maintaining economic viability is consistent with the WSD objective to "provide opportunities for creative development that contribute[s] to the rejuvenation and revitalization of the special district." The Director's discussion of the WSD objectives will be discussed in relation to the third requirement of the variance test--the intent and purpose of the LUO--as the objectives do not pertain to whether the record establishes that Kyo-ya would be denied the reasonable use of its land under the first requirement of the variance test.

[23] Because the parties analyze one aspect of reasonable use of the land or building in terms of economic viability, we apply this measure of analysis in this case.

necessary to maintain economic viability."  Surfrider argues that the Director's finding as to economic viability is erroneous because it is not supported by the record.  Kyo-ya, the Director, and Friends of Labor argue that the Director sufficiently found that the Project was necessary for economic viability and that it was Surfrider's burden to prove otherwise.

To reiterate, in order to demonstrate deprivation of reasonable use within the meaning of the City Charter, the property owner must establish an inability to make reasonable use of its land or building without the requested variance. Korean Buddhist, 87 Hawai‘i at 234-35, 953 P.2d at 1332-33; McPherson, 67 Haw. at 605-06, 699 P.2d at 28; see also RCCCH § 6-1517 n.30; Final Report of the Charter Commission of the City and County of Honolulu 1971-1972 at 33 (citation omitted) ("[T]he property owner must be able to show, if he complies with the provisions of the ordinance, that he cannot make any reasonable use of his property.").[24]

---

[24]     In Korean Buddhist, the applicant sought a variance after the fact for its newly constructed temple hall that exceeded the maximum height allowed under the zoning code.  87 Hawai‘i at 234-35, 953 P.2d at 1332-33.  In affirming the Director's denial of the variance, this court held, inter alia, that "'reasonable use' of the land, within the meaning of the City Charter, is not necessarily the use most desired by the owner."  Id.  The court reasoned that because the applicant failed "to establish that it could make no reasonable use of the land or its Hall without" the height variance, the first requirement of the variance test had not been satisfied.  Id.

(continued . . .)

Further, "the fact that [an applicant] might make a greater profit by using his property in a manner prohibited by the ordinance is considered irrelevant, since almost any individual applicant could make that same showing." Korean Buddhist, 87 Hawai'i at 234-35, 953 P.2d at 1332-33 (quoting Final Report of the Charter Commission of the City and County of Honolulu 1971-1972 at 33); see also 3 E.C. Yokley, Zoning Law & Practice, § 20-7 (4th ed. 1979) ("Under this prong of the test, the fact that another use would be more profitable to the property owner is not a sufficient basis for a board to grant a variance."); Dep't of Planning and Permitting, City and Cnty. of Honolulu, Zoning Variance Guidebook (August 3, 2010), http://www.honoluludpp.org/Portals/0/pdfs/zoning/zvar2.pdf ("Variances cannot be given to . . . allow the applicant to save money or make more money on a proposed project.").

As Surfrider argues, although the Director found that the variance was necessary to "maintain economic viability,"

_____

(continued . . .)

Similarly, in McPherson, this court found the record to be "devoid of any evidence that the applicant could not make reasonable use of the land or buildings in conformity with the [zoning code] or her pre-existing nonconforming use," and thus we concluded that the ZBA's contrary finding was clearly erroneous. 67 Haw. at 605-06, 699 P.2d at 28. In other words, because the applicant had not established that she could not make other reasonable use of the land or buildings but for the variance, the court held that the applicant failed to satisfy the first requirement of the variance test. Id.

there is no financial data[25] in the record to support such a finding; rather, it appears the Director merely recited statements Kyo-ya made in its variance application: "[t]he Applicant indicates" that the "facilities and amenities of the existing [DHT] are extremely outdated"; if the DHT "is not allowed to be redeveloped that would contribute to the decline of the already aging structure"; and "[t]he Applicant suggests" that an older hotel "cannot compete with other tourist destinations that offer superior accommodations."[26]  However, these statements are merely assertions of Kyo-ya unsupported by the record.  See McPherson, 67 Haw. at 606, 699 P.2d at 29

---

[25]    Although the Director did not make any economic findings as to the existing DHT or the proposed Project, he did make findings as to the economics of the Banyan Wing and a theoretical reconstructed Banyan Wing in his analysis of the second requirement of the variance test.  The Director found that a reconstructed Banyan Wing may increase in value by 79 percent compared with the current wing.  However, as noted supra, the Banyan Wing is a historic structure that cannot be redeveloped for a minimum of 25 years.  Additionally, the Director noted that Kyo-ya indicated "that they have no intention of removing the historic Banyan Wing."  Thus, the economic findings pertaining to the Banyan Wing are not relevant to whether Kyo-ya would be denied the reasonable use of the land if not allowed a variance from the Coastal Height Setback for the Project.

[26]    The entirety of the Director's analysis pertaining to economic viability of the DHT tower is as follows:

> The Applicant indicates that the facilities and amenities of the existing Diamond Head Tower are extremely outdated. If the DHT is not allowed to be redeveloped, that would contribute to the decline of the already aging structure. The Applicant suggests that older hotels that offer substandard visitor accommodations are not attractive to the modern visitor and often cannot compete with other tourist destinations that offer superior accommodations. Thus, the proposal is necessary to maintain economic viability.

("[T]he Charter limits the power of the [Director] to grant variances to cases where a rather narrow and somewhat technical set of facts must be established.").

Moreover, even if the record established that the DHT was "extremely outdated" and would continue to decline if not allowed to be redeveloped, those "facts" alone would not support the finding that the Project is necessary to maintain economic viability because the LUO expressly allows existing nonconforming buildings within the WSD to be repaired and renovated as long as the level of nonconformity is not increased.[27]  See ROH § 21-9.80-4(e)(3) ("Nonconforming uses shall not be limited to 'ordinary repairs' or subject to value limits on repairs or renovation work performed.").

Additionally, ROH § 21-9.80-4(e) allows a nonconforming structure to be replaced by an entirely new

---

[27]    Other jurisdictions have held that if "the property has a nonconforming use, there is an additional burden on the applicant to establish that maintaining the nonconforming use will not allow the applicant to realize a reasonable return."  2 Am. Law. Zoning § 13:15 (5th ed.); see also O'Connor v. Overall Laundry, 183 N.E. 134, 138 (Ind. App. 1932) ("It is not a hardship or practical difficulty in the meaning of the statute when a corporation's business has outgrown its building to refuse to allow them to add to their present building."); Crossroads Recreation, Inc. v. Broz, 149 N.E.2d 65, 67-69 (N.Y. 1958) (upholding the denial of a variance to renovate a nonconforming use, because the owner of a nonconforming gas station failed to show he could not realize a reasonable return by converting the property to a use permitted by the zoning ordinances); Goodman v. Zoning Bd. of Review of Cranston, 254 A.2d 743 (R.I. 1969) (reversing the grant of a variance to convert a nonconforming nursery into a car dealership because there was insufficient proof that continued use of the nursery would deprive the owner of all beneficial use of the land).

structure, subject to certain conditions.  Accordingly, even assuming there was evidence in the record that established that the existing DHT is not economically viable due to its aging structure and "substandard accommodations," renovation and or replacement of a nonconforming building subject to certain conditions is expressly authorized by the LUO.  For this reason also, there is insufficient evidence in the record to show that the Project is necessary to maintain economic viability.  See ROH § 21-9.80-4(e).

The Zoning Variance Guidebook (Variance Guidebook) provides sample cases to illustrate how each requirement of the variance test may be properly applied.  Zoning Variance Guidebook, supra.  The Variance Guidebook's second sample case provides a particularly relevant example of an applicant who requested a variance to build an addition to a dwelling that would encroach into the side yard setback.  The Guidebook notes in this hypothetical case, "The applicant argue[d] that the encroachment is necessary because it is the most practical, cost-effective solution."  In evaluating the variance request, the Variance Guidebook notes that the applicant could build a conforming addition in other locations on the lot.  Id. at 4. The Guidebook concludes that the "variance cannot be supported,"

38

in part, because "the applicant is not deprived of reasonable use, since alternatives are available." Id. at 5.

The Variance Guidebook's example is consistent with the Korean Buddhist decision where this court held that an applicant who sought a variance to construct a taller building than that authorized by the ordinance had not demonstrated deprivation of reasonable use because the record showed that the applicant could have constructed a shorter, compliant building. 87 Hawai'i at 234-35, 953 P.2d at 1332-33. Thus, the mere fact that Kyo-ya cannot build the specific building design it desires is not sufficient to support a finding that Kyo-ya would be deprived of the reasonable use of its land or building. See Singer v. Phila. Zoning Bd. of Adjustment, 29 A.3d 144, 150 (Pa. Commw. Ct. 2011) ("It is well-settled that in order to establish unnecessary hardship for a dimensional variance, an applicant must demonstrate something more than a mere desire to develop a property as it wishes or that it will be financially burdened if the variance is not granted."); Korean Buddhist, 87 Hawai'i at 234-35, 953 P.2d at 1332-33.

As noted, the standard to evaluate deprivation of reasonable use under the charter is that the property owner must establish an inability to make reasonable use of its land or building without the requested variance. Korean Buddhist, 87

39

Hawai'i at 234-35, 953 P.2d at 1332-33 (applicant for variance failed to show that it could not make reasonable use of the land or its hall); McPherson, 67 Haw. at 605-06, 699 P.2d at 28 (accord).  Kyo-ya apparently disputes the applicability of this standard, arguing to this court that Surfrider's interpretation of Korean Buddhist is misleading and would eliminate the Director's discretion.  However, the standard stated in the Charter's variance test is clear--an applicant has the burden of establishing that the applicant would be deprived of the reasonable use of land or buildings if the provisions of the zoning code were strictly applicable.  Korean Buddhist, 87 Hawai'i at 234, 953 P.2d at 1332 ("The burden of establishing the factual foundation for [each prong of the variance test] rests with the applicant.").  Here, the reliable, probative, and substantial evidence does not support the conclusion that the variance is necessary for Kyo-ya to maintain economic viability of its land or building.

### ii. PD-R Permit Allowances

The next reason[28] stated by the Director to show denial of reasonable use was that Kyo-ya would not be able to develop

---

[28]     The second reason given by the Director to show denial of reasonable use merely stated the effect of the zoning code provisions on the Project: the buildable area of the DHT lot would be reduced to less than 35

(continued . . .)

in accordance with its PD-R permit if the variance was not allowed.  Under a PD-R permit, an applicant can apply to the City Council and the Director for flexibility from specifically enumerated provisions of the LUO within the WSD upon showing that "timely, demonstrable contributions benefiting the community and the stability, function, and overall ambiance and appearance of Waikiki are produced."  ROH § 21-9.80-4(d).  While a PD-R permit allows an applicant to apply for flexibility from requirements relating to density, height, precinct transitional height setbacks, yards, open space, and landscaping, the permit notably does <u>not</u> allow flexibility with respect to the Coastal Height Setback provision.

Therefore, an applicant who wishes to build a denser, taller building with less open space may apply for a PD-R permit upon showing that the project will benefit the community and contribute to the stability and overall ambience of Waikiki.  On the other hand, an applicant who wishes to build within the Coastal Height Setback must apply for a variance and satisfy the three requirements for issuance of a variance.  By excluding the Coastal Height Setback from the list of provisions that may be

(continued . . .)

percent with a density less than the existing DHT and the Coastal Height Setback would limit the building to approximately 170 feet.

given flexibility under a PD-R permit and requiring an applicant to prove unnecessary hardship as a result of the setback requirement, the City Council manifestly indicated that the Coastal Height Setback is of greater significance and requires greater protection than numerous other provisions in the LUO.

Here, the Director appears to have sidestepped the City Council's intent for an applicant to meet the distinct three-part hardship test by defining and evaluating the "reasonable use" of Kyo-ya's property in terms of the PD-R permit's flexible provisions. Specifically, the Director used Kyo-ya's inability to obtain the full benefit from the PD-R permit as a reason to find that Kyo-ya would be denied reasonable use of the site if the Coastal Height Setback was applied.[29] In other words, by obtaining the PD-R permit prior to seeking the variance, Kyo-ya was able to argue that it was deprived of the reasonable use of its land by pointing to the loss of the increased density and height that the PD-R permit allowed. Thus, the three requirements that must be satisfied to obtain a variance from the Coastal Height Setback were

_____

[29]    Kyo-ya's PD-R permit allowed a 20 percent increase in density, an increased building height of 308 feet, and a decrease in required open space from 50 percent to 45 percent.

42

subordinated to Kyo-ya achieving the benefits of the PD-R permit.

The effect of coordinating the permits in this manner resulted in the ostensible inclusion of the Coastal Height Setback as being among the provisions that can be modified under the PD-R permit. This is directly contrary to the intention of the City Council: the Coastal Height Setback stands apart from the PD-R permit, and an applicant seeking a variance from the Coastal Height Setback requirements must independently satisfy the unnecessary hardship test. Accordingly, the PD-R permit should not have been considered as a basis for determining reasonable use in order to satisfy the first requirement of the variance test, as it enables circumvention of the Coastal Height Setback.

Additionally, even if the PD-R permit were relevant to the determination of "reasonable use," the Director noted that there was an alternative building design that would achieve the increased density authorized by the PD-R permit without encroaching into the Coastal Height Setback.[30] Thus, the

_____

[30] The Director found that if Kyo-ya "is not allowed to encroach into the coastal height setback, the building design would have to be drastically changed from a relatively tall, slender design to a shorter, wider building with a larger footprint in order to achieve the density permitted by the PD-R." (Emphasis added). The Director disregarded the alternative design after finding that it would obstruct views from Kalākaua

(continued . . .)

Director expressly acknowledged that Kyo-ya could in fact achieve the full density permitted by its PD-R permit with an alternative design that would not encroach into the Coastal Height Setback.

Additionally, aside from the single "monolithic" building design hypothesized in the Director's Decision, the Director did not discuss any other alternative building designs that would not require a 74 percent encroachment into the Coastal Height Setback apparently because there was no evidence in the record regarding alternatives. Thus, in effect, the Director's Decision presented an artificial "either/or" scenario where Kyo-ya could only build either the proposed Project or a "shorter, wider building." This scenario resulted from the absence of evidence regarding other available options, including the renovation of the existing DHT, the construction of a compliant building design, or a building design with a greater degree of compliance with the Coastal Height Setback.

An applicant for a variance is not deprived of the reasonable use of its land or buildings simply because the applicant may not be able to utilize the maximum potential

(continued . . .)

Avenue and thus be contrary to the WSD objectives. We address this finding with regard to the third requirement of the variance test.

44

density of the site.  See Korean Buddhist, 87 Hawaiʻi at 234-35,

953 P.2d at 1332-33; Singer, 29 A.3d at 150.  Accordingly, the

Director's discussion of the PD-R permit was not relevant to the

analysis of reasonable use under the first requirement of the

unnecessary hardship test.

### iii. 1965 Beach Agreement

Next, the Director found that Kyo-ya would be denied

reasonable use of its land because if the State had constructed

the beach as required by the 1965 Beach Agreement, "the size and

configuration of the buildable area of the site would be

significantly different."

In 1965, the State and certain shoreline property

owners, including Kyo-ya's parent company, entered into a

private agreement under which the State agreed to use its best

efforts to extend the beach approximately 180 feet seaward of

the current certified shoreline.  The 1965 Beach Agreement was

not incorporated into the LUO or referenced in the provisions of

the subsequently enacted WSD.  While there have been beach

replenishment projects in the years since the agreement, the

beach width envisioned by the 1965 Beach Agreement was never

realized.  Therefore, the agreement had no effect on the

certified shoreline by which the Coastal Height Setback is

measured.[31]  Kyo-ya, the Director, and Friends of Labor
(collectively, Appellees) cite no authority that would authorize
the 1965 Agreement to have legal effect on a variance
application.

The Appellees contend that the Director did not rely
on the 1965 Beach Agreement to determine whether Kyo-ya would be
denied reasonable use; however, the plain language of the
Director's Decision indicates otherwise.[32]  In its variance
application, Kyo-ya acknowledged that the shoreline was never
extended pursuant to the terms of the 1965 Beach Agreement yet
contended that if the beach had been extended, "almost no
portion of the [Project] would encroach into the Coastal Height
Setback."  The Director adopted Kyo-ya's reasoning in his
decision and concluded the variance, "viewed in [the context of
the 1965 Beach Agreement], is not excessive."  (Emphasis added).
Additionally, after the Director had extensively discussed the

_____

[31]     See note 3 for the definition of "certified shoreline."

[32]     Kyo-ya argued to the Director, the ZBA, and the circuit court
that the 1965 Beach Agreement conferred upon it certain rights and
expectations that must be considered in determining what reasonable use Kyo-
ya could expect of its property under the variance test.  Kyo-ya also
contended that the agreement "altered real property law as it applied to the
Moana Parcel and the 'bundle of legal sticks' that [Kyo-ya] held as its
property."  During the variance application proceeding, Kyo-ya maintained
that "the Director was required to consider the shoreline that the State of
Hawai'i is absolutely legally obligated to maintain for the benefit of Kyo-ya
and its adjoining landowners (and the general public)" and that if the
Director had done so, "there would have been a more permissive variance
issued."

Beach Agreement, the Director found that "[f]or these and other reasons, it can be recognized that [Kyo-ya] would be denied reasonable use of the site if not allowed to encroach into the [Coastal Height Setback]."  (Emphasis added).

By placing significant reliance on the 1965 Beach Agreement as a basis for its conclusion that Kyo-ya would be denied reasonable use if encroachment was not allowed, the Director effectively evaluated the reasonable use of Kyo-ya's property in terms of the width of the beach intended by the 1965 Beach Agreement.  Other statements in the Director's Decision further support the conclusion that the Director relied on the 1965 Beach Agreement to determine whether Kyo-ya would be deprived of reasonable use of its land.

For example, after referencing the 1965 Beach Agreement, the Director stated, "A closer look at the 1965 Agreement suggests that if the State had constructed the beach as required, the size and configuration of the buildable area of the site would be significantly different," "the beach fronting the [Project site] might be as much as 180 feet wider than it is today," and thus "the building setback and height encroachments would be reduced significantly."  While there is no doubt that the buildable area of the lot would be different if the beach

had been extended, the fact is that the beach was not extended 180 feet, and the shoreline was never certified at that point.

Despite the Director's findings relating to the intended beach width under the 1965 Beach Agreement, the variance must be based on the certified shoreline, and the hardship must be established in consideration of the facts and circumstances in effect at the time of the application. See ROH § 21-9.80-4(g)(2). Thus, consideration of the 1965 Beach Agreement and its hypothetical effects on Kyo-ya's land if the shoreline had been extended 180 feet seaward were entirely irrelevant to determining whether Kyo-ya would be deprived of the reasonable use of its land.

The Director's Decision demonstrates that he not only considered the 1965 Beach Agreement to determine if Kyo-ya would be deprived of the reasonable use its land, but that he also considered the agreement when determining the extent of the variance to grant. In fact, the Director's partial approval was conditioned on, inter alia, "compliance with the 1-to-1 (45-degree angle) coastal height setback as measured from the face of the existing concrete seawall/walkway structure [] 180 feet seaward (the approximate beach width intended in the [1965 Beach Agreement)." (Emphases added). By relying on "the beach width intended in the 1965 Agreement," the Director shaped the

48

variance to match the 1965 Beach Agreement.  However, the governing conditions for the variance approval must be based on valid criteria, not a hypothetical shoreline envisioned by an unexecuted private contract with no legal effect on the certified shoreline or the Coastal Height Setback.[33]  The Director's conditioning of the variance on the shoreline hypothesised by the 1965 Beach Agreement was therefore invalid. Further, by conditioning the variance on a theoretical shoreline derived from the 1965 Beach Agreement, the Director essentially disregarded the certified shoreline.

The Director's fifth reason for finding that Kyo-ya would be deprived of reasonable use of its land or buildings was because the Beach Maintenance Project would extend the beach by 40 feet and thus reduce the extent of the encroachment.  As discussed, the Coastal Height Setback must be measured from the current certified shoreline and the hardship test met by the circumstances in place at the time of the variance application.

---

[33]     The ZBA found that "[a]t no time prior to the closing of the evidentiary portion of this proceeding did Petitioner's [sic] offer any competent, reliable or probative evidence that the 1965 Beach Agreement, which had been entered into by the State of Hawaii and Applicant's parent company, was without legal effect, had terminated by its terms, or had been terminated by the parties or operation of law."  Despite Kyo-ya's arguments and the ZBA's findings, there is no legal basis for concluding that the 1965 Beach Agreement could be validly considered by the Director in evaluating the Zoning Variance Application.

Therefore, the Beach Maintenance Project was also improperly considered by the Director.

Pursuant to ROH § 6-1517, the Director was required to "specify the particular evidence which supports the granting of a variance" with respect to each requirement of the variance test. As to the first requirement, the Director was required to conclude that Kyo-ya would not be able to make other reasonable use of its land without a variance that allowed it to encroach 74 percent into the Coastal Height Setback. Korean Buddhist, 87 Hawai'i 217, 953 P.2d 1315. The Director not only failed to apply this standard as stated in the Charter, but apparently applied a different standard, concluding that Kyo-ya would be deprived of "a" reasonable use.

Further, the Director's finding that the variance was necessary for economic viability of the land or building was without evidentiary support in the record. The Director's remaining findings as to the PD-R permit, the 1965 Beach Agreement, and the Beach Maintenance Project are not relevant to determining whether Kyo-ya would be deprived of the reasonable use of the property. Thus, because the reliable, probative, and substantial evidence on the whole record does not support the Director's conclusion that the variance was necessary to maintain economic viability, his conclusion as to the first

50

requirement of the variance test was clearly erroneous.  See
Bremer, 104 Hawai'i at 51, 85 P.3d at 158.

Additionally, "[t]he admission of irrelevant or
incompetent matter before an administrative agency does not
constitute reversible error if there is substantial evidence in
the record to sustain the agency's determination."  Shorba, 59
Haw. at 397, 583 P.2d at 319 (quoting Schyman, 133 N.E.2d at
525-26).  However, if a petitioner can show prejudice resulting
from the admission of irrelevant or incompetent evidence, the
admission of such evidence may be grounds for reversal.  See
id.; Price, 77 Hawai'i at 176, 883 P.2d at 637.  "[P]rejudice
cannot be alleged to the admission of improper evidence unless
it be shown that the [agency] relied on it."  Shorba, 59 Haw. at
397, 583 P.2d at 319 (quoting Schyman, 133 N.E.2d at 561-562).

Here, Surfrider has clearly demonstrated that the
Director placed great reliance on the 1965 Beach Agreement and
the Beach Maintenance Project to find that Kyo-ya would be
deprived of the reasonable use of its land or building if it was
required to comply with the Coastal Height Setback as measured
from the certified shoreline.  While any reliance on the 1965
Beach Agreement and Beach Maintenance Project was error, the
reliance in this case was crucial to the Director's finding of
deprivation of reasonable use, even to the extent that it

provided the basis for the configuration of the variance that was actually granted; thus, because the incompetent evidence was significant to the Director's conclusion, the admission of such evidence was clearly prejudicial and "grounds for reversal." Id.

### B. Unique Circumstances

The second requirement of the City Charter's variance test requires a showing that "the request of the applicant is due to unique circumstances and not the general conditions in the neighborhood, so that the reasonableness of the neighborhood zoning is not drawn into question." RCCCH § 6-1517. The City Charter provides the meaning for unique circumstances: unique circumstances "has to do with whether specific attributes of the parcel are present that justify the request for a variance." RCCCH § 6-1517 n.30 (emphasis added) (citing Korean Buddhist, 87 Hawai'i 217, 953 P.2d 1315). Thus, an owner's unusual plans for a parcel do not, in themselves, constitute "unique circumstances." McPherson, 67 Haw. at 606, 699 P.2d at 28.

Surfrider argues that the Project site is not particularly unique to justify the variance. In addition, Surfrider argues the ZBA and Director's Decision were clearly erroneous because it shows the Director addressed only the "unique circumstances" part of the variance test and "failed to

address whether 'the reasonableness of the neighborhood is []

drawn into question' by the granting of a variance of

unprecedented magnitude."  The Appellees respond that the

Director properly found Kyo-ya's lot contained unique

circumstances that presented development challenges.  The

Appellees also contend that the phrase "so that the

reasonableness of the zoning is not drawn into question" merely

explains the purpose behind "unique circumstances."

In his Decision, the Director concluded that Kyo-ya's

variance application was based upon unique circumstances and not

general neighborhood conditions and that the variance would not

draw into question the reasonableness of the neighborhood

zoning.  In support of his conclusion, the Director made the

following relevant findings: (1) the Project site is one of the

narrowest along the shoreline in the area with an average lot

depth of about 182 feet; (2) compared with the DHT tower and

Surfrider Tower, the Banyan Wing generates the least amount of

revenue per room;[34] (3) the Project site is subject to the 100-

foot coastal setback and an average 20-foot front yard setback

along Kalākaua Avenue, thereby reducing the buildable area by an

average of 120 feet; (4) the shoreline along the site is subject

_____

[34]     We do not address this finding as it is not relevant to whether the site has specific attributes that justify the request for a variance.

53

to drastic change by artificial means compared with natural beaches that cannot be altered; and (5) the Beach Maintenance Project may extend the beach by roughly 40 feet and thus reduce the Project's encroachments by 40 feet.

### i. Narrow Lot & Banyan Wing

Surfrider does not directly challenge the Director's finding that the Project site is one of the narrowest along the shoreline, or that because Kyo-ya was prohibited from redeveloping the historic Banyan Wing, Kyo-ya was limited to developing the narrower DHT portion of the property. Nevertheless, as made clear in the Variance Guidebook's second and third example cases, the narrowness of a lot may not be sufficient, by itself, to find unique circumstances when alternative building designs are available.

In the Variance Guidebook's second example, discussed above, because the applicant could build a conforming addition in other locations on the lot, the guidebook concluded that the "variance cannot be supported," in part, because "alternatives are available." Zoning Variance Guidebook, supra.

In the third example of the Variance Guidebook, the applicant "has a small, narrow lot, only 35 feet in width," while "[o]ther lots in the area are generally 50 feet wide." Id. at 5-6. "The applicant cannot raise the existing dwelling

54

and add a new ground floor without a variance because the second story would encroach <u>slightly</u> into the required height setback along one side." <u>Id.</u> (emphasis added).  The Variance Guidebook provides that the "variance can be supported," because, in part, the lot "is the only such narrow lot in the neighborhood, which is a unique circumstance," and because "[t]he structural conditions and dimensions of the existing dwelling do not afford a reasonable alternative." <u>Id.</u> (emphasis added).

Here, Kyo-ya appears to have other alternatives that would not require a 74 percent encroachment into the Coastal Height Setback; thus, the relatively narrow lot does not alone justify the variance.  Additionally, the WSD allows for the refurbishment and rebuilding of nonconforming structures so long as the extent of its nonconformities does not increase.  It would appear that the Director recognized that the narrowness of the site was not sufficient to support granting the variance, and thus the Director evaluated and relied upon additional factors, discussed below, to support the finding of unique circumstances.

### ii. Coastal Height Setback, Front Yard Setback

A significant reason underlying the Director's conclusion that Kyo-ya's variance application was based upon unique circumstances was that the Project site was subject to

55

"the 100-foot coastal setback . . . and an average 20-foot front yard setback along Kalākaua Avenue," which together "reduce the buildable area depth by an average of 120 feet."  However, as Surfrider argues, both the Coastal Height Setback and the average 20-foot front yard setback apply to all ocean front properties in the WSD, and thus, the setbacks do not constitute unique circumstances.  See ROH § 21-9.80-4; LUO Table 21-9.6(B) (front yard setbacks must be "an average of 20 feet for zoning lots fronting Kuhio Avenue, Kalākaua Avenue, Ala Moana and Ala Wai Boulevard within the resort mixed use precinct"); see also Collins v. Carusone, 126 A.D.2d 847, 848 (N.Y. App. Div. 1987) (since all properties near the subject property share the same hardship, the hardship is not "unique"); accord Greenawalt v. Zoning Bd. of Adjustment of Davenport, 345 N.W.2d 537, 544 (Iowa 1984).

By combining the footage of both setbacks and determining the property's buildable area would be reduced by 120 feet, the Director used generally applicable requirements to find unique circumstances.  However, since all shoreline properties in Waikiki have their buildable area reduced by setback requirements, this is not a unique attribute of Kyo-ya's parcel.  See ROH § 21-9.80-4; LUO Table 21-9.6(B).  Moreover, as defined by the City Charter, "unique circumstances" "ha[ve] to

do with whether specific attributes of the parcel are present that justify the request for a variance." RCCCH § 6-1517 n.30 (emphasis added) (citing Korean Buddhist, 87 Hawai'i 217, 953 P.2d 1315). The provisions of a zoning ordinance are not "specific attributes of [a] parcel," but rather they are legal requirements that prescribe how a parcel may be used and developed.[35]

The Director further based his finding that the Project site was unique on the fact that the shoreline fronting the property "is subject to drastic change by artificial means" and the lot is subject to the 1965 Beach Agreement and the Beach Maintenance Project. However, like the setback provisions of the LUO, these characteristics of the shoreline are not unique to the Project site but apply to all properties fronting Waikiki Beach, and they are not "attributes" of the parcel.

Therefore, because the setbacks, shoreline, 1965 Beach Agreement, and Beach Maintenance Project are not attributes of the parcel, but rather are external conditions present in the

---

[35] If, for example, a zoning ordinance imposed a maximum area height of 350 feet above which no building could be constructed, that factor itself would not constitute a unique circumstance. On the other hand, if a particular parcel was graded 20 feet higher than other parcels in the neighborhood, and an applicant sought a variance to construct a building on that parcel with a maximum ground to ceiling height of 360 feet, the fact that the parcel is 20 feet higher than neighboring parcels may be considered a unique factor because it is a unique attribute of the parcel itself.

neighborhood, the Director's findings that these conditions are "unique" attributes of Kyo-ya's property are clearly erroneous.

The only remaining evidence supporting the Director's conclusion that the second requirement was satisfied due to unique circumstances were his findings that the individual Project site was narrow and that the lot contained the Banyan Wing. However, because the record does not show that the unique attributes of the lot--the narrowness and Banyan Wing--prevent Kyo-ya from renovating the DHT or replacing it with a new building that meets zoning requirements, the narrowness of the lot and the Banyan Wing do not sufficiently demonstrate the parcel's "unique circumstances."

Consequently, the reliable, probative, and substantial evidence in the record does not support the Director's conclusion that the variance was necessary due to the unique attributes of the property, and thus his conclusion as to the second requirement of the variance test was clearly erroneous. See Bremer, 104 Hawai'i at 51, 85 P.3d at 158. Additionally, because the Director significantly relied on external conditions that are not relevant to the uniqueness of the parcel and are commonly found in the neighborhood, the Director's Decision was based on incompetent evidence that significantly prejudiced Surfrider. Shorba, 59 Haw. at 397, 583 P.2d at 319. Finally,

58

the Director's reliance on conditions commonly found in the

neighborhood necessarily draws the neighborhood zoning into

question as every property along the shoreline would be found to

have "unique" attributes and be potentially eligible for a

variance from the provisions of the LUO.  Accordingly, the

Director's conclusion that Kyo-ya satisfied the second

requirement of the variance test was clearly erroneous.

## C. Essential Character of the Neighborhood and Intent and Purpose of Zoning Ordinance

To satisfy the third requirement for granting a

variance, the record must show that "the request, if approved,

will not alter the essential character of the neighborhood nor

be contrary to the intent and purpose of the zoning ordinance."

RCCCH § 6-1517 (emphasis added).  Thus, in this case, the

pivotal determination is whether the 74.3 percent encroachment

into the Coastal Height Setback would alter the essential

character of the neighborhood or be contrary to the intent and

purpose of the zoning ordinance.  See Korean Buddhist, 87 Hawai'i

at 234-35, 953 P.2d at 1332-33 (court considered whether the

increased height of the temple hall, not the temple hall itself,

would alter the essential character of the neighborhood).

Notably, in contrast to the first two requirements of the

variance test requiring affirmative findings of deprivation of

the reasonable use of the property and unique circumstances of

the property, the third requirement necessitates factual
findings that the variance will <u>not</u> alter the neighborhood's
essential character and will <u>not</u> be contrary to the intent and
purpose of the variance test.[36]

Surfrider argues that the Director erroneously found
that the Project, rather than the variance, would not alter the
essential character of the neighborhood and would not be
contrary to the intent and purpose of the zoning ordinance.
Surfrider additionally argues that the Director did not address
whether or not the 74.3 percent encroachment itself "might be
contrary to the intent and purpose of the WSD."  In response,
the Appellees argue that the Director properly considered the
intent of the zoning code, as well as the essential character of
the neighborhood, and correctly concluded that the variance
would be consistent with both.

### i. Essential Character of the Neighborhood

The Director found, as characterized in the LUO, that
Waikiki is a "densely populated and highly developed, urbanized
area" with a wide mix of land uses, many of which are

---

[36]     Importantly, rather than making findings that the variance is
consistent with certain objectives, the variance test requires the Director
to make findings as to whether the variance request is not contrary to the
intent and purpose of the zoning ordinance.  This analysis necessitates
first, determining the intent and purpose of the zoning ordinance, and then
evaluating the requested variance in light of such intent and purpose.

"nonconforming and exceed the height limit and maximum density
[], encroach into required yards and setbacks, and lack the
minimum open space and landscaping."  Based on these findings,
the Director concluded that the Project would not alter the
essential character of the neighborhood.  However, the
Director's conclusion that the neighborhood's essential
character would not be altered is flawed.

First, determining that the Waikiki neighborhood[37] is a
"densely populated and highly developed urbanized area" with
many nonconforming properties does not preclude the City Council
from enacting an ordinance targeted at altering the
neighborhood's character when a sufficient basis exists to do
so.  See Nine A, LLC v. Town of Chesterfield, 950 A.2d 197, 203
(N.H. 2008).

In Town of Chesterfield, the town determined that a
lake, a unique natural resource, needed protection and enacted a
special district to prevent, among other things, "the
overcrowding of, and undue concentration of population on and

---

[37]    We note that the Director's Decision did not discuss the fact
that the WSD contains multiple neighborhoods.  See ROH § 21-9.80-1(c)
("Support the retention of a residential sector in order to provide stability
to the neighborhoods of Waikiki." (emphasis added)).  Thus, while the
Director's characterization of the neighborhood may reflect general
attributes of the WSD, those attributes do not necessarily represent the
"essential character" of the neighborhood that will be affected by the 74.3
percent encroachment into the Coastal Height Setback.

around, the lake." Id. With the creation of the special district, the town prohibited cluster residences around the lake and set forth new minimum lot requirements and minimum frontage requirements. Id. A developer sought a variance[38] to build cluster residences within the district on the basis that cluster housing was reflective of the current character of the neighborhood. Id. In affirming the zoning board's denial of the applicant's variance request, the Supreme Court of New Hampshire held that although the town previously permitted cluster residences in the lake district, the town rightfully determined that "the need to preserve a unique natural resource outweighed having the character of the neighborhood control the zoning ordinance." Id.

---

[38] In Town of Chesterfield, to obtain a variance the applicant was required to prove the following:

> (1) the variance will not be contrary to the public interest;
>
> (2) special conditions exist such that literal enforcement of the ordinance results in unnecessary hardship;
>
> (3) the variance is consistent with the spirit of the ordinance;
>
> (4) substantial justice is done; and
>
> (5) granting the variance will not diminish the value of surrounding properties.

Town of Chesterfield, 950 A.2d at 201.

Here, the City Council enacted the provisions of the WSD, including the Coastal Height Setback, in response "to the rapid development of the 1960s and 1970s, and the changes produced by that development" to protect the unique identity of Waikiki. ROH § 21-9.80. Accordingly, as in Town of Chesterfield, it is evident that the City Council was greatly concerned with the changing character of Waikiki and thus took affirmative steps to preserve Waikiki's unique Hawaiian identity. Therefore, the fact that there are nonconforming properties in the WSD that were built prior to the enactment of the special district in 1976 does not provide a basis for a finding that the variance is consistent with the essential character of the neighborhood.

Further, the presence of nonconforming uses and structures should not serve as the basis for further non-conformance. Martin v. City of Alexandria, 743 S.E.2d 139, 146 (Va. 2013); Packer v. Hornsby, 267 S.E.2d 140-43 (Va. 1980). In a factual context with some similarities to this case, the Supreme Court of Virginia reviewed the zoning board's approval of an applicant-homeowners' request for a variance[39] to encroach

_____

[39] The requirements to obtain a variance in Packer are similar to the City Charter's variance test in this case. In Packer, the zoning board was permitted to authorize a variance only if "a literal enforcement of the

(continued . . .)

73 percent into an oceanfront setback in order to expand their house.  Packer, 267 S.E.2d at 141.  The applicants' stated reasons for the request were "improvement to existing structure is needed" and "development of adjacent property makes adherence to set back a hardship."  Id. at 141.  The court noted that "[t]he applicants already have a dwelling, . . . and they can enlarge the house without violating the setback requirement by adding to the west side of the structure," but the applicants preferred to expand to the east "in order to have a better floor plan with a better view of the ocean."  Id. at 143.  The zoning board granted the variance on the basis that the applicant "should be entitled to build as close to the ocean as 'the average of the houses along the block.'"  Id. at 143.  In

---

(continued . . .)

provisions (of a zoning ordinance) will result in unnecessary hardship" and it finds:

> (1) That the strict application of the ordinance would produce undue hardship.
>
> (2) That such hardship is not shared generally by other properties in the same zoning district and the same vicinity.
>
> (3) That the authorization of such variance will not be of substantial detriment to adjacent property and that the character of the district will not be changed by the granting of the variance.

Packer, 267 S.E.2d at 142.

reversing the zoning board's decision, the court cautioned as follows:

> If, as the Board concluded, one owner of the property complying with a restriction should be allowed to conform his structure to neighboring nonconforming structures, then every such owner would be entitled to do so. A board of zoning appeals could, by granting variances piecemeal, ultimately nullify a zoning restriction throughout the zoning district. But the statute provides that all variances shall be in harmony with the intended spirit and purpose of the ordinance . . . .

Id. (emphasis added).[40]

The principle that existing nonconformity should not serve as the basis for additional nonconformity is itself reflected in the LUO, which provides while nonconforming uses and structures may be repaired and rebuilt, "constraints are placed on [the] nonconformities to facilitate eventual conformity with the provisions of the [LUO]." ROH § 21-4.110. Thus, although the LUO allows existing nonconforming uses to continue, the expressed intent of the LUO is to reduce the extent of nonconformity over time.

The Director's finding of a "large number of nonconforming uses and structures" in the area is not a valid basis for granting another nonconforming use. If nonconforming

---

[40] The Supreme Court of Virginia also noted that "[p]roximity to the ocean is doubtless a 'privilege or convenience' coveted by every homeowner along the beach," "[b]ut a zoning restriction upon that privilege does not constitute an 'unnecessary hardship' within the meaning of the Code." Id. at 142.

use is so pervasive that it is shared by the majority of
properties in a zoning district, the proper remedy is to seek an
amendment to the zoning ordinance, not a variance.  See Levy v.
Bd. of Standards & Appeals of N.Y.C., 196 N.E. 284 (N.Y. 1935);
Appeal of Michener, 115 A.2d 367 (Pa. 1955).  Thus, the presence
of existing nonconformities in the neighborhood to justify new
noncomformities constitutes incompetent evidence, and the
Director's reliance on such evidence undermines the protection
of Waikiki's unique identity and dilutes the intended effect of
the Coastal Height Setback.

Consequently, there is not reliable, probative, and
substantial evidence on the whole record supporting the
Director's conclusion that Kyo-ya's request to encroach 74
percent into the Coastal Height Setback would not alter the
essential character of the neighborhood, and thus the third
requirement of the variance test was not satisfied.

### ii. Not be Contrary to the Intent and Purpose of the Zoning Ordinance

Although we hold that the Director's conclusion that
the third requirement of the variance test was met is clearly
erroneous, we also review whether the Director properly
concluded that the variance would not be contrary to the intent
and purpose of the zoning ordinance.  Thus, we consider the
intent and purpose of the WSD and Coastal Height Setback and the

Director's conclusion that a 74 percent encroachment would not be contrary to such intent and purpose.

### a. Intent and Purpose of the WSD

The WSD was enacted by the City Council in 1976 in response "to the rapid development of the 1960s and 1970s, and the changes produced by that development," in order "to guide carefully Waikiki's future and protect its unique Hawaiian identity." ROH § 21-9.80.

The Council stated, "Waikiki needs to maintain its place as one of the world's premier resorts in an international market; yet, the sense of place that makes Waikiki unique needs to be retained and enhanced." Id. (emphasis added). The WSD provides, "The design of buildings and structures in the [WSD] should always reflect a Hawaiian sense of place, as outlined in the [district's] design controls." ROH § 21-9.80.

"Just as there is no universally accepted definition of 'aloha,' there is no universally accepted definition of a Hawaiian sense of place." WSD Design Guidebook at 3. Although there is no universal definition of "Hawaiian sense of place," the guidebook contains the following discussion of what "Hawaiian sense of place" means within the context of development in the WSD:

> The concern that Waikiki has lost some of its appeal as a tropical beach resort raises many questions about its future. A common opinion is that Waikiki needs to improve

> its physical attractiveness and enjoyment for residents, employees and visitors, <u>by restoring the images and experiences which make it unique.  A Hawaiian sense of place</u> is not just a particular architectural style which echoes our historical past, but is also <u>a reflection of attitudes, experiences, place, spaces and symbols which we have embraced as reminders of and contributors to a uniquely Hawaiian experience</u>.

<u>WSD Design Guidebook</u> at 5 (emphases added).  In particular, "[d]esign in Waikiki should compose spaces and elements in a way that <u>encourages experiencing the natural environment</u>."  <u>Id.</u> (emphasis added).

To contribute to the goal of establishing and preserving a Hawaiian sense of place, "[a]ll projects in Waikiki will be expected to make an appropriate contribution," and "[n]ew developments will be required to demonstrate a high degree of compliance with applicable objectives, guidelines and standards."  <u>Id.</u> (emphasis added).  Additionally, "[t]he renovation of existing buildings will be expected to comply to the extent possible."  <u>Id.</u>

Consequently, the City Council's intent and purpose in establishing the WSD was first and foremost to protect, retain, and enhance a Hawaiian sense of place by restoring the experiences, places, and spaces that make Waikiki unique.

### b. Intent and Purpose of the Coastal Height Setback

Although each provision of the WSD is designed to reflect a Hawaiian sense of place, few can endeavor to achieve this far-reaching goal as effectively as the Coastal Height

Setback, which was designed to maximize public safety, the sense of open space, lateral access along the beach, and public enjoyment of Hawaii's coastal resources. ROH § 21-9.80-4(g)(2); WSD Design Guidebook at 4, 25. Additionally, the Coastal Height Setback, together with the other provisions of the WSD, is intended to reduce the perception of crowding, enhance the aesthetics of Waikiki, and generally impart a greater sense of Hawaiiana into the built environment. Id.

For example, although requirements pertaining to landscaping and building materials undoubtedly affect the Hawaiian sense of place in Waikiki, they do not directly impact lateral access along the beach, the public's enjoyment of coastal resources, or the sense of open space and perception of crowding. Thus, among the restrictions put in place by the WSD, the Coastal Height Setback uniquely affects the preservation of Waikiki's Hawaiian sense of place.

c. **Director's Findings on Intent and Purpose of the Ordinance**

The City Charter provides that the third requirement is satisfied only if "the request, if approved, will not alter the essential character of the neighborhood nor be contrary to the intent and purpose of the zoning ordinance." RCCCH § 6-1517 (emphases added). Accordingly, because Kyo-ya's variance application sought approval to encroach into the Coastal Height

69

Setback, the Director's evaluation should have focused on whether granting the variance application--i.e., a requested 74 percent encroachment into the Coastal Height Setback--would be contrary to the intent and purpose of the Coastal Height Setback and the WSD.  See N. Bergen Action Grp. v. N. Bergen Twp. Planning Bd., 585 A.2d 939, 944 (N.J. 1991) ("Because zoning restrictions are enacted to further municipal planning and zoning objectives, it is fundamental that resolutions granting variances undertake to reconcile the deviation authorized . . . with the municipality's objectives in establishing the restriction.").

However, rather than considering whether the variance request--i.e., a 74 percent encroachment into the Coastal Height Setback--was contrary to the intent and purpose of the WSD and the Coastal Height Setback, the Director evaluated whether the Project was consistent with three of the fourteen WSD "objectives."[41]  Consequently, the Director made no findings and

---

[41]     Additionally, the three objectives relied upon by the Director do not show that the Project would not be contrary to the intent and purpose of the WSD.  First, the Director found that the Project would "[p]rovide for the ability to renovate and redevelop existing structures which otherwise might experience deterioration."  However, this WSD objective, which concerns the renovation of existing structures, has little bearing on the variance application in this case because, as discussed, the record does not show that the existing DHT may not be renovated or replaced without the variance. Thus, consideration of this WSD objective is not implicated by the variance application.  See Ten Stary Dom P'ship v. Mauro, 76 A.3d 1236, 1245 (N.J. 2013).

(continued . . .)

provided no analysis as to whether the 74 percent encroachment

would be contrary to the intent of the Coastal Height Setback,

which is to reduce the perception of crowding, and maximize the

sense of open space, lateral access along the beach, and public

enjoyment of the coastal resources. Nor did the Director's

findings address whether the proposed 74 percent encroachment

would protect, retain, and enhance a Hawaiian sense of place by

restoring the experiences, places, and spaces that make Waikiki

unique. The Director appears to have misapprehended the

applicable legal standard set forth in the ordinance, having

made no findings with respect to the effects of the 74 percent

encroachment. Thus, the Director's conclusion that the

---

(continued . . .)

The Director's second finding that the Project is consistent with the WSD objective for "creative development" did not reference the full text of the objective, which requires the Project to be "able to facilitate the desired character of Waikiki for areas susceptible to change." LUO § 21-9.80-1(h) (emphasis added). The enactment of the Coastal Height Setback indicates that the City Council concluded that development close to the shoreline was to be strictly limited. Accordingly, a building that substantially encroaches into the Coastal Height Setback would not appear to be consistent with the "desired character of Waikiki."

The Director's third finding was that the Project "provides a better public access to the beach, [and] view channels from Kalakaua Avenue to the ocean." However, the objective relied upon begins as follows: "Maintain, and improve where possible: mauka views from public viewing areas in Waikiki, especially from public streets." LUO § 21-9.80-1(j). Replacing an 8-story building with a 26-story tower adjacent to the shoreline would not appear to increase the mauka view from the public viewing area of Waikiki Beach.

71

encroachment would not be contrary to the intent and purpose of the zoning ordinance is based on an error of law.

By the same token, the Director's analysis must be focused on "those purposes of zoning that are actually implicated or triggered by the requested relief" rather than the Project as a whole.  See Ten Stary Dom P'ship v. Mauro, 76 A.3d 1236, 1245 (N.J. 2013) ("[N]ot every deviation from prescribed bulk standards implicates the same concerns.").  Accordingly, as stated, the Director's findings should have evaluated the impacts of a 74 percent encroachment into the Coastal Height Setback on a Hawaiian sense of place, the perception of crowding, sense of open space, and public enjoyment of the coastal resources--purposes that are actually implicated by the requested variance.  Instead, the Director made findings as to the Project's compliance with selected objectives of the WSD rather than on the impacts of the encroachment as related to the intent and purpose of the Coastal Height Setback and WSD.  Thus, the Director's findings did not, as required by the City Charter, "specify the particular evidence which supports the granting of the variance."  RCCCH § 6-1517.

Finally, even if consideration of the Project, rather than the effects of granting the variance application, were the correct measure for issuance of a variance, the Director's

summary findings as to the three WSD objectives were clearly insufficient to support a conclusion that a 74 percent encroachment is not contrary to the intent and purpose of the Coastal Height Setback and the WSD. This is particularly true when the magnitude of the variance is significant. "[I]t is self-evident that the greater the disparity between the variance granted and the ordinance's restriction, the more compelling and specific the proofs must be that the grant of the variance" will not be contrary to the intent and purpose of the zoning ordinance. N. Bergen Action Grp., 585 A.2d at 944.

As further explained by the Supreme Court of New Jersey,

> an impingement of the zoning restrictions may be of varying degrees[;] [t]he less of an impact, the more likely the restriction is not that vital to valid public interests. Conversely, where the change sought is substantial, the applicant will have to demonstrate more convincingly that the variance will not be contrary to the public good and general welfare expressed in the ordinance.

Chirichello v. Zoning Bd. of Adjustment of Monmouth Beach, 397 A.2d 646, 654 (N.J. 1979) (emphasis added); cf. McPherson, 67 Haw. at 606, 699 P.2d at 29 (holding that the requisite evidence that must be adduced to satisfy the variance requirements involves proof of a rather narrow and somewhat technical set of facts).

In this case, because of the great disparity of Kyo-ya's request from the ordinance's restriction--an encroachment

73

of 74.3 percent into the Coastal Height Setback--"the more compelling and specific the proofs must be that the grant of the variance" will not be contrary to the intent and purpose of the zoning ordinance.  Thus, the findings set forth in the Director's Decision are markedly inadequate in light of the magnitude of the requested encroachment into the Coastal Height Setback.  Further, the lack of specificity in the Director's findings does not allow this court to conduct a meaningful review of the Director's Decision regarding this aspect of the third requirement of the variance test.[42]  See also Gougeon v. Bd. of Adjustment of Stone Harbor, 245 A.2d 7, 10 (N.J. 1968) ("Supporting and explanatory facts and factual findings for the conclusions must be set forth.  Unless such facts and findings are recited, a reviewing court cannot determine whether the Board acted properly and within the limits of its authority.").

        In summary, in concluding that the Project was consistent with the intent and purpose of the ordinance, the Director erred for several reasons.  First, the Director did not make findings demonstrating that the variance request--a 74

_____

[42]    The Director's findings did not expressly take into consideration the effects of the magnitude of the requested encroachment on the intent and purpose of the Coastal Height Setback and WSD.  Thus, on the face of the Director's Decision, it is not clear that the Director appropriately weighed the extent of the proposed encroachment against the intent and purpose of the ordinance.

percent encroachment into the Coastal Height Setback--was not contrary to the intent and purpose of the WSD and the Coastal Height Setback, and instead the Director relied entirely on the Project's compliance with portions of three of fourteen WSD objectives. Second, the Director did not evaluate the impacts implicated by the variance request in relation to the purpose of the zoning ordinance. Third, the Director's analysis did not expressly take into consideration the extent of the variance requested, and thus his abbreviated findings were insufficient to conclude that a 74 percent encroachment into the Coastal Height Setback was not contrary to the intent and purpose of the zoning ordinance.

Accordingly, the Director's finding that the Project is consistent with "several important WSD objectives" misapprehended applicable law, and the Director's conclusion that a 74 percent encroachment into the Coastal Height Setback was not contrary to the intent and purpose of the zoning ordinance was not supported by findings that "specify the particular evidence which supports the granting of the variance." RCCCH § 6-1517. Consequently, the third requirement of the variance test was not satisfied.

## VI.  Conclusion

In order for the Director to grant a variance request, the applicant must satisfy each requirement of the variance test.  Here, none of the requirements were met.  Accordingly, the circuit court's judgment, the ZBA Order, and the Director's Decision are reversed.  See Town v. Land Use Comm'n, 55 Haw. 538, 550, 524 P.2d 84, 92 (1974).

Linda M. B. Paul                    /s/ Paula A. Nakayama
for petitioners
Surfrider Foundation et al.         /s/ Sabrina S. McKenna

Peter T. Kashiwa,                   /s/ Richard W. Pollack
Lisa Woods Munger,
Randall C. Whattoff,                /s/ Michael D. Wilson
David J. Hoftiezer and
Lisa A. Bail
for respondent Kyo-ya
Hotels & Resorts, LP

William Meheula and
Natasha Baldauf
for respondent 20,000
Friends of Labor

Donna Y. L. Leong,
Don S. Kitaoka and
Brad T. Saito
for respondent Department
of Planning and Permitting
City and County of Honolulu

